## ROBERT G. SHAW & others *vs.* LEONARD STONE & others.

Where one of the parties to a written contract, without objection from the other, introduces parol evidence to add to such contract, with reference to a particular point, he cannot afterwards object to the introduction of similar evidence by the other party to the same point.

A general agent, for buying and selling, cannot, without special authority, resort to extraordinary and expensive means, to raise money for his principal.

The record of a vote of the directors of a manufacturing corporation, appointing an agent, and an acceptance and record of the report of a committee, appointed to arrange with him for his compensation, do not constitute a contract in writing.

Where the clerk of a manufacturing corporation was applied to, by letter, for information as to the terms upon which a firm, of which the clerk was also a member, conducted the business of the corporation, as its agents, and made a verbal reply thereto;—it was held, that such reply was admissible in evidence against the firm, as the confession or admission of a party.

A factor, having a lien on goods consigned to him for sale, to a greater amount than the value of the goods, and being called upon by a creditor to give security, agreed with such creditor and a third person, that the latter should become the purchaser of the goods, and give his notes therefor, at an agreed price, on a credit of eight months; that the notes should be deposited with the creditor as collateral security; that the goods should remain with the factor, in order to be resold by him; that the proceeds thereof, when sold, whatever the amount might be, should be paid over to the creditor, towards payment of the debt; that the notes of such third person should thereupon be cancelled; and the agreement was carried into execution accordingly:—it was held, that the transaction was a valid sale of the goods to the first purchaser, and not a mere pledge to the creditor; and that, as between the principal and factor, the price of the goods was that for which they were first sold, and not that for which they were resold by the factor.

The agent of the H. M. Co. at Ware, being authorized for the purpose by a vote of the corporation, made drafts on D. B. & Co. of New York, payable to the order of G. S., treasurer of the company, and one of the firm of G. S. & Co., the agents of the company in Boston, which drafts were there accepted by D., one of the drawees, who was also a member of the firm of G. S. & Co., and were then indorsed by G. S., treasurer, and by G. S. & Co., and negotiated and disposed of by them for their own benefit, under an agreement with the H. M. Co. that they would pay them at maturity: G. S. & Co. having failed before the drafts became due, and being unable to take them up at maturity, the drafts, when due, were proved and allowed as claims against the H. M. Co., who had also failed in the mean time, and dividends were paid thereon by the assignees of the latter:—it was held, that the assignees of the H. M. Co. were entitled to charge the amount

of such drafts against G. S. & Co. in account; notwithstanding, that, on some of them, the indorsement of G. S., treasurer, was made by attorney; — that some of them were paid by one of the indorsers, subsequent to G. S. & Co., without previous demand of the acceptor, and notice to such indorser; — and that some of them had been negotiated and received in payment of or as collateral security for illegal loans.

A draft, by the agent of a manufacturing corporation, payable to " G. S., treasurer" thereof, is payable to him personally, though described as treasurer, and not merely as treasurer for the time being, and may be indorsed by him, as treasurer either in person, or by attorney.

THIS was a proceeding in equity, instituted by the plaintiffs, as the assignees of the Hampshire Manufacturing Company, against the defendants, as the assignees of Grant, Seaver and company, by a bill filed on the 26th of October, 1841, under the act of 1836, c. 238, "to regulate the assignment and distribution of the property of insolvent debtors."

The plaintiffs set forth in their bill, that, by an indenture dated April 26, 1837, they became the assignees, according to the provisions of the act aforesaid, of all the property and effects of the Hampshire Manufacturing Company, for the benefit of creditors; that they had sold and disposed of all the property so assigned, and had paid to each of the creditors (who were named in the bill) two dividends, one of twenty and the other of fifty per cent, making seventy per cent, of their respective demands; that, by an indenture dated April 22, 1837, Messrs. Grant, Seaver and company assigned to the defendants a claim against the Hampshire Manufacturing Company, the validity of which was denied by the other creditors and by the stockholders of the company, and the payment of which had therefore been resisted, and no dividends had been paid thereon, by the plaintiffs; that the plaintiffs were and always had been ready and willing to pay to the defendants, as the assignees of Grant, Seaver and company, an equal proportion with the other creditors of the Hampshire Manufacturing Company, whenever and as soon as such assignees should establish the validity of the claim so assigned to them, and that they (the plaintiffs) always had been and were ready to adopt any legal mode of determining

the validity and amount of such claim, but that the defend-
ants, though requested, had neglected to take any measures for
that purpose; and that, having sold all the property assigned
to them, the plaintiffs were desirous to close the assignment,
and to make an entire and final distribution of the proceeds
in their hands, which they could not safely do, so long as the
claim of the defendants, as the assignees of Grant, Seaver and
company, against the Hampshire Manufacturing Company,
remained unliquidated, nor until a judicial determination
should be made as to the validity and amount thereof: The
plaintiffs therefore prayed, that the defendants, as such as-
signees, might be compelled, agreeably to the provisions of
the act above mentioned, to have the validity of their claim
against the plaintiffs' assignors determined by a jury, upon an
issue to be framed under the direction of the court, or by
referees chosen by the parties; or, if the defendants should
neglect to answer the bill, that they should be excluded
from any participation in the funds in the hands of the plain-
tiffs as such assignees.

The defendants, in their answer, which was filed on the
25th of February, 1842, set forth an assignment to them by
Grant, Seaver and company, as stated in the plaintiffs' bill, of
a claim against the Hampshire Manufacturing Company, par-
ticularly described in a copy of the assignment, exhibited
with the answer, amounting, as the defendants averred, to a
balance of $174,179·20. They also contended, among other
things, that two of the claims mentioned in the bill, on which
dividends had been paid, namely, those of the American and
Globe Banks, had been improperly admitted and allowed by
the plaintiffs.

At the March term, 1842, the plaintiffs filed a special repli-
cation; and, by consent of parties, four issues were framed
and directed to be submitted to a jury; one of which, at the
November term, 1843, was referred to an auditor.

In January, 1844, the plaintiffs filed a supplemental bill, for
the purpose of making the American and Globe Banks parties
defendant; and, in May and June following, those banks filed

answers, severally insisting upon the validity of their respective claims, and that the plaintiffs were estopped to deny them.

In December, 1845, the auditor made his report, upon the matters submitted to him; at the March term, 1846, the four issues, which had been directed to be tried, were vacated; and, on the 23d of July, 1846, the plaintiffs filed an amended bill, which is the foundation of the present proceedings.

The plaintiffs, in their amended bill, set forth specifically and in detail the several matters in dispute between Grant, Seaver and company, and the Hampshire Manufacturing Company, namely, 1st, a charge made by the latter against the former of $ 20,000, for expenses and losses incurred and paid by the former in raising money for the use of the company; 2d, a credit, claimed by the Hampshire Manufacturing Company, of $ 9,404·15, being the difference between the sum actually credited, and that which the company alleged ought to be credited, on account of a sale of goods made by Grant, Seaver and company, as the agents of the Hampshire Manufacturing Company, to William H. Odiorne; 3d, a claim in set-off for the amount of certain drafts, made by the Hampshire Manufacturing Company, for the accommodation of Grant, Seaver and company, which, not having been paid by the latter, had been allowed and in part paid by the plaintiffs as claims against the former.

The defendants, in their answer to the amended bill, insisting on the validity of the claims and demands set up by them, and denying their liability as alleged by the plaintiffs, set out at length the facts and circumstances on which they relied in defence.

Issues were thereupon severally directed, to try the validity of the claims, constituting the first and second items in dispute between the parties. The subject of the third was referred to a master, to receive such evidence thereon, as the parties might see fit to exhibit and produce before him, and to report the same to the court.

The issues thus directed were subsequently tried before *Shaw*, C. J., and were both found by the jury in favor of the

plaintiffs, subject to the opinion of the whole court, upon certain questions of law, reserved at the trial, which will be hereafter stated.

From the report of the judge, who presided at the trial, and from the evidence stated by the master in his report, it appeared, that certain relations had existed, and certain transactions had taken place, between these parties, which, so far as the several matters in controversy are concerned, were as follows.

The Hampshire Manufacturing Company was a corporation legally established within this commonwealth, for the purpose of manufacturing cotton and woollen yarn and cloth, and of making and selling machinery, castings, and gearing, in the town of Ware, in the county of Hampshire; and for these purposes, was invested with the powers and privileges, and subject to the duties and requirements, contained in the several statutes relating to manufacturing corporations.

Messrs. Grant, Seaver and company, a firm composed of Benjamin B. Grant, George Seaver, George R. Dinsmore, and Robert Barnett, were a mercantile house established and doing business in Boston, having a branch established in New York, composed of the same individuals, with the addition of George W. Grant, under the name of Dinsmore, Barnett and company. Grant, Seaver and company were the owners of a majority in value of the shares in the capital stock of the Hampshire Manufacturing Company.

On the 20th of November, 1834, Grant, Seaver and company were, by a vote of the directors, "appointed the general agents in Boston of the Hampshire Manufacturing Company, for selling and buying, and also for taking a general supervision and control of the affairs of the company, subject, however, to instructions, from time to time, from the directors." A committee was at the same time appointed, to "make arrangements with them for their compensation as agents."

On the 4th of December, following, the committee made their report, (which was accepted,) recommending that a commission be allowed the agents of two and a half per cent

on all sales made in Boston, and of four per cent on all sales in New York and elsewhere; that a commission of one per cent be allowed them on all purchases; that no other commission or brokerage be allowed on sales; and that the compensation thus established should be in full for the performance of the duties of treasurer and clerk, and all other services.

Immediately on their appointment, Grant, Seaver and company entered upon the performance of their duties as agents, and so continued until their failure in April, 1837. They were at the same time agents for other manufacturing companies. During the years 1836 and 1837, George Seaver, one of the firm, was clerk and treasurer of the Hampshire Manufacturing Company.

In conducting the business of the company, as its agents, Grant, Seaver and company kept books in their own names, sold the goods of the company in their own names, and took notes therefor payable to themselves. The notes so taken frequently embraced the prices of goods belonging to other companies; but, as the accounts of the several companies, for whom Grant, Seaver and company acted as agents, were kept distinct from each other, the proportion of each, in any note received by the agents, could be readily ascertained. Whenever the agents gave their acceptances for the benefit of the company, the latter was charged with the amount, and credited with the interest for the time such acceptances had to run, at the time they were given. Sales made on credit were credited to the company at the time they were made, and the interest thereon debited, and subsequently charged back, if not paid. The agents rendered their accounts quarterly to the company

On the 19th of January, 1835, the directors of the company, by a vote then passed, authorized their agents to cause any additions, alterations, and repairs to be made in the machinery used for the manufacture of woollens, and also to fill the building then used for a machine shop with machinery for manufacturing purposes, if, in their judgment, such a

20*

course would promote the interests of the company; provided, that the whole expense of such alterations, repairs, and additions should not exceed the sum of twenty-five thousand dollars. The directors also voted, at the same time, that the treasurer be authorized to use the credit of the company, whenever it might be required, for the importation of cotton, to an amount not exceeding forty thousand dollars, at any one time; it being understood, that the agents should meet the payment of any debt or liability thus contracted by the treasurer.

It appeared, that, from the 1st of October, 1835, to the time of the failure of the Hampshire Manufacturing Company, Grant, Seaver and company were in the practice of raising money for the use of the former, by discounts and other negotiations of mercantile paper, and by other means, at a greater rate than six per cent; but that the expenses of this kind were not charged as items of account against the company; and that no greater than the legal rate of interest appeared on the books of the agents, or in the quarterly accounts rendered by them.

On the 5th of November, 1836, the Hampshire Manufacturing Company, being indebted to Grant, Seaver and company, in a large sum of money, which the former had no available means to pay, passed a vote, that the treasurer be authorized to instruct the agent at Ware, to draw on Grant, Seaver and company, or on houses elsewhere in the United States, from time to time, for such sum or sums, as he might deem for the interest of the company, subject to the approval of the president of the company, or, in his absence, of R. G. Shaw, one of the directors; and that all drafts, thus authorized and indorsed by the treasurer, should be binding on the company.

In pursuance of this vote, drafts were drawn by Bartlett, the agent of the company at Ware, on Dinsmore, Barnett and company, of New York, payable to George Seaver, treasurer of the Hampshire Manufacturing Company. These drafts were forwarded, usually in blank, to the counting house of

Grant, Seaver and company, in Boston, where they were immediately accepted, for Dinsmore, Barnett and company, by Dinsmore, who was a member of that house. They were then indorsed by Seaver, in person, if present, or, if absent, by Grant, as his attorney, under a power of attorney given for the purpose, which had been lost. In the former case, the indorsement was "George Seaver, Treasurer;" in the latter, "George Seaver, Treasurer, by B. B. Grant, Attorney." These drafts, when filled up, were certified as approved by the president, and were then indorsed and negotiated, as occasion required, by Grant, Seaver and company, for their own benefit. The transactions, under the above vote, did not appear on the books of the Hampshire Manufacturing Company, but were merely a mode adopted by the parties, by which to furnish Grant, Seaver and company with the use of the credit of the manufacturing company. It was at the request of Grant, Seaver and company, and upon their agreement to protect the acceptors therefrom, that the drafts so made were accepted by Dinsmore, Barnett and company; and Grant, Seaver and company were also under an agreement with the Hampshire Manufacturing Company to take up all such drafts at maturity.

On the 22d of April, 1837, when Grant, Seaver and company failed, there were outstanding debts, which had been issued and negotiated as above, and which remained unpaid, to the amount of $59,000; all of which had been presented to the assignees of the Hampshire Manufacturing Company, as valid demands against the company, and had been allowed by them as such, and payments of dividends made thereon, as mentioned in the plaintiffs' bill. The plaintiffs claimed the right to charge the amount of the drafts, so allowed by them, against Grant, Seaver and company, in account. It was objected to the allowance of this claim, that Seaver had no authority to indorse by attorney; that some of the drafts, which had been allowed by the plaintiffs as valid claims, had been paid by Shaw, one of the plaintiffs, as indorser, without any demand having been previously made of the acceptor, or any notice given to him (Shaw) as indorser; and that some

of them had been received by banks or individuals, in payment of or as collateral security for loans and discounts, which were contrary to law. Some of the drafts, held by the American Bank, were included in a note given by Grant, Seaver and company to the bank, on settlement, but the bank continued to hold them afterwards, by agreement, as collateral security for the note.

In April, 1837, Grant, Seaver and company were liable and indebted to the American Bank in a large amount, for which they were called upon by the bank to give security. They informed the bank that they had no paper or stocks, which they could furnish for that purpose; but that they had manufactured goods belonging to the Hampshire and Neponset companies, for sale, on which they had a lien for advances and liabilities, which they had made and entered into for those companies, to an amount exceeding the value of the goods; and that they were willing that the bank should have the proceeds of these goods, when realized by a sale, to be applied in payment of their debt to the bank, provided any arrangement could be legally made for that purpose. The directors of the bank, being of opinion that the power of Grant, Seaver and company, as agents, was insufficient to enable them to pledge goods which had been consigned to them for sale, took the advice of counsel thereupon, who advised that the goods could not be directly pledged, and recommended a sale, as the best mode of accomplishing the purpose of the parties.

It was then agreed between the parties, that Grant, Seaver and company should make bills of sale of the goods, on which they had the lien above mentioned, to William H. Odiorne, cashier of the American Bank, and that his notes should be taken therefor, payable in eight months; that these notes should be deposited with the bank as collateral security for the debts and liabilities of Grant, Seaver and company; that the proceeds of the goods, when realized by a sale, should be paid to the bank; and that Odiorne should not, in any event, be called upon to pay his notes, but that the same

should be given up, on payment to the bank of the proceeds of the goods. It was also agreed, that the bank should receive the entire proceeds of the goods, even if they exceeded the amount of Odiorne's notes, and that Grant, Seaver and company should be credited with the actual sum received for the goods, whether more or less than the amount of the notes.

In pursuance of this agreement, Grant, Seaver and company, on the 12th, 13th, and 17th of April, made bills of sale, to Odiorne, of sundry goods on which they had a lien as above mentioned, and took his notes therefor, payable in eight months, which were put into the bank as collateral security. No examination of the goods was made, either by Odiorne, or the directors of the bank. The prices were estimated and inserted in the bills of sale, at about the rates for which similar goods had been previously sold; but, at that time, there was no sale, and consequently no market price, for such goods, in consequence of the embarrassed condition of financial affairs. A formal delivery of the goods, without any removal thereof from the store of Grant, Seaver and company, was made to Odiorne, who gave a person employed by Grant, Seaver and company, as a porter, in their store, a written authority to keep possession of the goods there for him. Grant, Seaver and company, having the goods in their possession, made sales of them, from time to time, in the same manner as they sold other goods, and finally closed the balance at auction, and paid over the proceeds to the American Bank, on which the notes given by Odiorne were cancelled.

The goods belonging to the Hampshire Manufacturing Company, which were embraced in the sale to Odiorne, at the prices named in the bills of sale, and after deducting a commission of two and a half per cent, amounted to $35,301·04, which was credited to the company, in the books of its agents, under date of April 27th, as the amount of sales to Odiorne. The sum paid the bank was $25,896·89. The company, some time subsequent to the 22d of April, 1837, made a demand upon Odiorne, for the goods sold to him, with which he refused to comply. The

plaintiffs claimed an allowance of the whole sum for which the goods were sold to Odiorne.

The first issue was directed to try, whether the defendants, as the assignees of Grant, Seaver and company, were entitled to charge and be allowed the sum of $20,000, or any part of such sum, for the losses sustained by Grant, Seaver and company, in raising money to carry on the business of the Hampshire Manufacturing Company, from the 1st of October, 1835, to the time of the failure of the latter, as charged in the accounts exhibited by the defendants, in their answer to the plaintiffs' amended bill.

On the trial of this issue, the defendants called Grant, Dinsmore and Barnett, three of the partners in the firm of Grant, Seaver and company, and inquired of them severally, whether Grant, Seaver and company had agreed, at their own cost, to advance capital for the use of the Hampshire Manufacturing Company; to which the witnesses testified that they had not so agreed; and this evidence was received without objection on the part of the plaintiffs.

The plaintiffs subsequently offered evidence of conversations between Dixon, the president of the Hampshire Manufacturing Company, and Grant, one of the firm of Grant, Seaver and company, previous to the 20th of November, 1834, and also of conversations between Grant, Dixon, and Coolidge, one of the directors of the Hampshire Manufacturing Company, at a time between the 20th of November, 1834, and the 4th of December following, for the purpose of proving therefrom, that Grant, Seaver and company, as agents of the Hampshire Manufacturing Company, undertook and agreed to furnish the company with capital or funds from their own resources, at the rate of six per cent. This evidence was objected to by the defendants, but admitted, subject to their exception.

The plaintiffs also offered in evidence, for the same purpose, a letter addressed by Parks, Wright and company, to George Seaver, clerk of the Hampshire Manufacturing Company, requesting information from him as to the terms on

which Grant, Seaver and company transacted the business of that company; and the plaintiffs also offered proof of a verbal reply made to this letter by Seaver. The defendants objected to the admissibility of the letter and reply as evidence, but the same were admitted, subject to their exception.

The second issue was directed to try, whether the plaintiffs were entitled to claim and be allowed, as a credit in the accounts between Grant, Seaver and company, and the Hampshire Manufacturing Company, the sum of $9,404·15, or any less sum, in addition to a credit of $25,896·89, exhibited and allowed, as a credit to the latter, on account of the goods sold to Odiorne.

On the trial of this issue, the facts relating thereto appearing as already stated, the court directed the jury thereon, as matter of law, that the plaintiffs were entitled to be allowed, as a credit, the said sum of $9,404·15, in addition to the sum previously credited.

The jury, under these instructions, and upon the evidence submitted to them, found both issues in favor of the plaintiffs; subject to the opinion of the whole court, upon the exceptions taken, as above stated, to the evidence for the plaintiffs on the first issue, and to the correctness of the instructions with reference to the second.

The third and last subject in dispute was the claim of the plaintiffs to be allowed to charge, by way of set-off, against Grant, Seaver and company, the amount of the drafts drawn for their accommodation by the Hampshire Manufacturing Company, which were outstanding at the time of the failure of Grant, Seaver and company, and which were afterwards allowed by the plaintiffs and in part paid as valid claims against the Hampshire Manufacturing Company.

The cause was argued at a former term, by *R. Choate* and *E. Blake,* for Shaw and others; by *C. G. Loring* and *C. B. Goodrich,* for Stone and others; by *T. Parsons* and *T. P. Chandler,* for the American Bank; and by *W. Gray,* for the Globe Bank.

Shaw, C. J. This is a bill in equity, commenced by Shaw,

Blake and Seaver, assignees of the Hampshire Manufacturing Company, against Leonard Stone and others, assignees of Grant, Seaver and company, formerly merchants, and agents and factors of the Hampshire Manufacturing Company.

In April, 1837, the parties were in failing circumstances. On the 22d, Grant, Seaver and company made an assignment to Stone and others, of the balance of account due to them, as such agents and factors, from the Hampshire Manufacturing Company, and, on the 27th of the same April, the latter made an assignment of their property, generally, in trust for their creditors.

Some time after this last assignment, and after many claims made upon the assignees by persons claiming to be creditors of the Hampshire Manufacturing Company, their assignees filed this bill against the assignees of Grant, Seaver and company, calling upon them to prove and establish their claims, setting forth some of them specifically, and denying their validity, and claiming that if not so established, they might be debarred and precluded from asserting such claims, so as to enable them to distribute the proceeds of the assigned property amongst the creditors entitled to them. After answers, an amended bill and additional answers, two issues were directed to try two contested questions, hereafter stated. Various matters were also referred to a master, who has made a report.

Upon the issues thus directed and found by the jury, and a report of the judge before whom these issues were tried, and upon the report of the master, taken as a statement of facts, several questions arose, which have been argued and considered by the court.

The first issue was directed to try whether Grant, Seaver and company were entitled to charge the Hampshire Manufacturing Company with the sum of $20,000, or any other sum, for the cost and expense of raising money for their use. This charge was made on the 27th of April, 1837, after Grant, Seaver and company had stopped payment, and made an assignment to Stone and others of the balance due to them

from the Hampshire Manufacturing Company. The jury returned a verdict in favor of the plaintiffs, thereby deciding that Grant, Seaver and company had no right to make the said charge against the Hampshire Manufacturing Company; and this verdict must stand, unless the objections taken by the defendants to the admission of evidence are well founded.

The agents, Grant, Seaver and company, kept their accounts regularly with the Hampshire Manufacturing Company, charging and crediting interest, and rendered those accounts quarterly to the manufacturing company. The charge in question was not founded on items, but on an estimate of the expense, which Grant, Seaver and company had previously incurred, by discounts at a greater rate than six per cent, or otherwise, in raising money to meet the wants of the Hampshire Manufacturing Company. No express contract was offered to sustain this charge; but it was placed on an implied liability, arising from the relations, in which the parties stood to each other, as principals and factors and general agents, and the exigency which they were under, as such factors and agents, to raise money for the company, at high rates of interest, beyond the regular interest charged in their quarterly accounts. They then proposed to show that money was so raised for the use of the manufacturing company, and thus to establish an implied promise on the part of the latter, to pay the expense of the operation. This being a charge made by the respondents, the assignees of Grant, Seaver and company, the burden was on them to establish it; and they took the affirmative and opened the case.

Much evidence was offered on both sides, which is not stated in the report, and upon which no question arises. It appeared, that Grant, Seaver and company were themselves large stockholders in the Hampshire Manufacturing Company, and owned a majority of the shares. It became a question between the parties, whether or not, at the time when Grant, Seaver and company were appointed factors and general agents of the Hampshire Manufacturing Company, these agents undertook, in general terms, to advance money and accept drafts,

and thus by their cash and credit to afford means to the company, when not afforded, and beyond those afforded, by their sales of manufactured goods, and the proceeds of them, to carry on the business of the company, in making repairs, and improvements at the factory, paying operatives, purchasing stock, &c. It was insisted by the company, that it was understood and agreed, that the agents would thus afford means by their own money and credit to carry on the business, not for any certain length of time, nor to any particular amount, but as a general course of business; but this was denied on the other side. The assignors, having been discharged, were competent witnesses, and three of them, Grant, Dinsmore and Barnett, were called by the defendants, as witnesses, to maintain the issue on their part. They were severally inquired of, whether, when they took the agency, they agreed to advance, at their own costs, capital for the use of the Hampshire Manufacturing Company; to which they testified that they did not. Subsequently, and after Shaw and others, the plaintiffs, had entered on their defence to this charge of $ 20,000, they offered parol evidence of conversations between Dixon, on the part of the company, and Grant, on the part of Grant, Seaver and company, before the 20th of November, 1834, the date of the vote by which the latter were appointed agents, and also between that day and the day of the acceptance of the report of the committee, December 4th following, to maintain the issue on their part, and to prove that Grant, Seaver and company, as such agents, undertook and agreed to furnish said company with capital or funds, from their own resources, at six per cent. The plaintiffs also offered in evidence, for the same purpose, a letter addressed by Parks, Wright and company, to George Seaver, clerk of the Hampshire Manufacturing Company, requesting information as to the terms, on which Grant, Seaver and company held the agency of the former, together with a verbal reply of Seaver thereto.

I. This evidence was objected to, on the part of Stone and others, but was admitted by the court, and this is the subject

of the first objection. This objection is placed on the ground, that by the vote of November 20th, 1834, and the subsequent acceptance of the report of the committee on the compensation of the agents, a contract in writing was made between the parties, which ought not to be enlarged or altered by paro evidence.

To this objection, there are several answers :

1. As the rules of evidence are made for the security and benefit of parties, all exceptions may be waived by mutual consent ; and, in each particular case, an objection may be waived by the party, who has a right to except. Now, when this species of evidence was offered by Stone and others, in order to prove what was the agreement and understanding of the parties, even though it might have been open to the exception stated, the defendants waived their exception by offering it, and the other party waived theirs by not excepting to its admission. To what extent did this waiver go? We think to the introduction of parol evidence bearing on the same point, and which tended to prove what was, or was not, the agreement and understanding of the parties, at the time of the establishment of the agency, in regard to one important particular. It was not merely a waiver as to the particular question, but to the species of evidence, as bearing upon that point in the issue. It is said, that the admission of incompetent or illegal evidence, on one side, not objected to, does not warrant the admission of incompetent evidence on the other side, when objected to. This principle is true, but is not applicable to the present case. When a party waives his exception to a particular species of evidence, alike in character, it ceases to be incompetent, and all evidence of the like kind, if pertinent, is admissible. A contrary decision would seem to violate the maxim, *audi alteram partem,* which lies at the very foundation of all regulated and intelligent judicial inquiry.

2. But another, and perhaps a more satisfactory ground, on which the testimony is admissible, is, that here was no contract in writing, no mutual agreement reduced to writing,

expressing the undertakings and obligations of the parties, on both sides. The vote of November 20th appointed Grant, Seaver and company general agents in Boston, for selling and buying, and also for taking a general supervision and control of the affairs of the company, subject to instructions from time to time from the directors. Nothing is said about the specific duties, which these agents are to perform, except what is implied in these very general terms, "general agents for selling and buying and taking a general supervision." The nature and extent of those duties must be proved *aliunde.* But, at the same time, a vote was passed, appointing a committee to make arrangements with Grant, Seaver and company for compensation. The extent of the committee's authority was to arrange for compensation; and their report is accordingly limited to the subject of compensation to Grant, Seaver and company, as selling and purchasing agents, including brokerage, and the performance of the duties of treasurer, clerk, and all other services; it does not purport to be a statement of the duties to be performed by the agents. But, further, this report has none of the characteristics of a written contract. It is in writing, because a corporation or board of directors must necessarily keep a record, journal, or written memorandum, of their doings, for their own information, and that of their associates and successors. But it is not signed by the parties; it is not ordered to be communicated to the agents for their acceptance; nor does it appear that the agents in fact accepted or acted upon it. It was merely information, given by the committee to the directors, of what they had verbally agreed upon with the agents. It is like a letter written by a party to one as agent, to govern him in dealing with another person; it may be evidence of a contract, but is not itself a written contract with that person. *Knapp* v. *Harden,* 6 Car. & P. 745.

3. If this vote and report together constitute the entire mutual agreement of the parties, so as to be unalterable by any parol evidence, which could be offered, we see no ground upon which the action can be maintained. Factors, as such,

are not authorized to go into the money market and to pay large bonuses and premiums, and high rates of interest for money, and charge such payments to their principals. Grant, Seaver and company were buying and selling agents, having a general supervision of the affairs of the company. They had no authority, resulting from that relation, to take such measures, and to make such charges against their principals; that not being a course of proceeding within the scope of the ordinary duty of such agents. Their only authority was, to receive the manufactured goods and dispose of them, and to use and employ the funds and means placed at their disposal by their principals. They could not take extraordinary and expensive means to raise money without special authority, or without proof of some other relation or agreement between the parties, than that arising out of the ordinary relation of principal and factor, as constituted by the vote relied on. The court are of opinion, that this evidence was rightly admitted.

The other objection, namely, to the admission of the letter from Parks, Wright and company to George Seaver, and the verbal reply of the latter thereto, we think, is already answered, if parol evidence be admissible. Very soon after the commencement of this agency, a letter was addressed to Seaver, who was at the same time clerk of the Hampshire Manufacturing Company, and one of the firm of Grant, Seaver and company, making an inquiry of him in regard to the terms on which the business of the manufacturing company was to be transacted by its agents. This letter was written by Parks, Wright and company, who had formerly held the same agency for the Hampshire Manufacturing Company. To this letter, Seaver made a verbal reply. This was objected to, but admitted.

It is obvious, that this letter of itself was wholly immaterial; it stated no fact and had no bearing, but to give effect to Seaver's answer; and the only real question is, whether that answer to the question thus proposed was competent evidence. Seaver was one of the firm of Grant, Seaver and

21*

company, who were then the parties alone concerned in this account, and under whom the defendants claim as assignees, and on whose rights they must stand. It is therefore the declaration of a party, and so admissible as a confession, which the other party has a right to give in evidence. It is admissible, because he was a party to the arrangement, and is supposed to know the fact; and, as a party, would not admit it unless true. He was one of the same firm, three of whom had been called and offered as witnesses on the other side. It is no objection, that he was an officer of the Hampshire Manufacturing Company, or that the letter was addressed to him in that capacity; he was not the less a party, as one of the firm of Grant, Seaver and company, so that neither he, nor those in privity with him, can object to the admission of his statements as evidence, at the instance of the other party.

The court are therefore of opinion, that the objections, made by the defendants to the admission of evidence, were not well founded; that the evidence was rightly admitted; and that the verdict for the plaintiff upon the first issue, disallowing the charge of $20,000, made by Grant, Seaver and company, against the Hampshire Manufacturing Company, must stand.

II. The subject of the second issue presents a question of much more difficulty. The facts being all undisputed, a *pro forma* verdict was taken for the plaintiffs by consent of parties, subject to the opinion of the whole court upon a case to be reported.

On the subject of this sale to Odiorne, the court are of opinion, that, as between the Hampshire Manufacturing Company and their assignees, the plaintiffs, on the one side, and Grant, Seaver and company, and the defendants, their assignees, on the other, the sale to Odiorne must be deemed a valid sale, at the prices specified, and therefore that the company are entitled to be credited with the amount of that sale, $35,301·04, instead of the amount for which the goods were afterwards sold and credited to the American Bank, $25,896·89, making a difference in the sum of $9,404·15

These sales, or supposed sales, took place on the 12th, 13th and 17th of April, 1837.

Grant, Seaver and company were largely in advance for the Hampshire Manufacturing Company, to an amount greater than the goods thus transferred to Odiorne, under the agreement with the American Bank. Still, they were factors and not owners; they had a lien on the goods for their general balance, but the right of property was in the company. As factors, they had no authority to pledge the goods for their own debt. Such a contract would pass no property to the pledgee; it could have no such effect by virtue of a right of property, because the agents had no such right; nor in virtue of their power as agents, because in making such a contract they would not be pursuing their power. Besides, by abusing their authority and parting with the possession, in the manner supposed, they would lose their lien, and the general owner would then be entitled to recover of the pledgee, in trover, without paying or deducting the amount for which the factor had a lien ; and so, if, after such a pledge, the goods be nominally sold to the pledgee, not in the usual course of a mercantile sale. *Kuckein* v. *Wilson*, 4 Barn. & Ald. 443.

The real and legal power, however, which Grant, Seaver and company had over these goods, was to sell them for cash or on credit. And as their lien would extend to the proceeds, as well as the goods, whether in notes or cash, and as they, being greatly in advance for the Hampshire Manufacturing Company, had a disposing power over the proceeds, they might agree, on making the sale, that the proceeds, to wit, in the present ·case, the notes, should be applied in satisfaction of or as security for their own debt. *Hudson* v. *Granger* 5 Barn. & Ald. 27.

If an agent, with authority to consign goods by an indorsement of bills of lading for sale, does so, and authorizes the consignee to sell and apply the proceeds to a debt of the agent, though the authority to sell will be valid to pass the property to the purchaser, if sold in a mercantile way, and in due course of business, yet the purchaser will be liable to the

owner for the proceeds, because the authority given by the agent to the consignee, to apply the proceeds to his own demand, is void. But, it seems, if the sale be hurried in order to enable the factor to realize his advances, and is not made in due course of business, it will be void. *Stierneld* v. *Holden*, 4 Barn. & Cres. 5. The law thus stated seems to be very clear. It was so understood by the parties, and they were so advised by counsel.

What, then, could Grant, Seaver and company do, to accomplish the object they had in view, which was to satisfy or secure their debts and liabilities to the American Bank, and to make their right over these goods available for that purpose ? They could not pledge the goods ; by attempting to do so the bank would obtain no security, and the factors would lose their lien. Had the transaction been in substance a pledge, under color of a sale, or in any other disguised form, the result would have been the same, on proof of its real character. But the agents had power to sell, and to give a long credit, and thereupon to take negotiable notes, and to apply those notes to satisfy their own debt to the bank. In doing this, they were bound as factors to sell at reasonable and fair prices ; and it would be contrary to their duty, and a fraudulent proceeding, on their part, to sell the goods at a greatly reduced price, or, in common parlance, to sacrifice them, in order the more hastily to realize the proceeds. In the actual state of the market, as the case finds, there was no regular demand for such goods, and no fixed market price. But the price, at which similar goods had been selling for some months previously, might properly be taken to be the fair value of the goods, as between the owner and factor, independently of the particular crisis in mercantile affairs, which then existed.

We think, therefore, that the actual intent of the parties, and the legal effect of the transaction, was, an execution by Grant, Seaver and company of their legal power to dispose of the goods by a sale ; to make a valid sale of them, so as to divest the right of property of the Hampshire Manufac-

turing Company; and to obtain notes for the price, and to dispose of those notes, as they lawfully might do, to meet their own debt. They agreed with Odiorne and the bank, that the proceeds of the goods, when resold, should be taken in full satisfaction of the notes of Odiorne, although such proceeds might fall short of the full amount of the notes. This might subject Grant, Seaver and company to a loss, if the resale of the goods should be made at reduced prices, as the event showed that they were; but the agents might well hope, that, during the eight months, which the notes had to run, the market might revive, and the goods sell at little or no reduction from previous prices. But, should it not be so, it would be a loss, which must rest on them. It is true, that Grant, Seaver and company agreed, that the actual proceeds of the goods, upon a resale, by them, should be taken in full satisfaction of the notes of Odiorne, and that they should not be held to account for them to the bank at the nominal price at which they were sold to Odiorne. This was an agreement which Grant, Seaver and company had full power and lawful authority to make, in virtue only of their disposing power over the notes; and was not an agreement which they had any authority to make as factors, in virtue of their authority under the Hampshire Manufacturing Company; and consequently, such agreement could not bind the company. The loss, therefore, must fall on the notes taken for the goods, which were the property of Grant, Seaver and company, and for which, in a certain contingency, they agreed to take less than par; and not on the sales of the goods, which must have been void, had not a real and actual sale been made.

The chance of loss, which might arise from the transaction, the factors might have been willing to take, in accomplishing a measure which would enable them to weather the existing storm, and as the best expedient, which, under the circumstances, they could resort to. Taking it as a real sale, it was a measure, by which the right of property of the Hampshire Manufacturing Company in the goods was divested, and the right of Grant, Seaver and company, and their assignees,

in the notes, was legally established. So the parties considered it; the bill of sale was made out and delivered to Odiorne; and the goods were delivered to him, and placed in the custody of his agent. The sales of the goods were credited in the books of Grant, Seaver and company, on the 27th of April, as of an actual sale to Odiorne. When, after the failure, the Hampshire Manufacturing Company demanded the goods of Odiorne, the demand was not complied with; though had it been a pledge to him, the appointee and agent of the American Bank, he would have been bound to deliver the goods on that demand. If the goods were afterwards in fact sold by Grant, Seaver and company, it must have been done by them under the authority and for the account of Odiorne and the bank, and not on the authority or for the account of the Hampshire Manufacturing Company. The company could have had no claim against them for any neglect, default or misconduct, as agents, for any breach of duty in the sale. For aught that appears, the bank, and Odiorne, as their appointee, might as well have appointed any other agent to sell the goods; at all events, the Hampshire Manufacturing Company could have no control over them, in that respect.

To decide that this was not an actual sale, but only a mode of pledging the goods, would be to give to a mere colorable and pretended sale, operating in the nature of a pledge, more force and effect, than, it is admitted, an actual pledge made in perfect good faith would have had. It is not for Grant, Seaver and company, or those standing in their place, after adopting a course, which they might adopt, as a real sale, and which divested the title of the owners of the goods, afterwards, and after having taken every step necessary to make it an actual sale, to turn round and say, that it was merely colorable and pretended; and the defendants, who came in merely as assignees, taking the same rights, subject to the same deductions and the same equities, with the assignors, are bound by all acts which bind their assignors. These transactions took place on the 12th, 13th and 17th of April,

and the defendants took their assignment on the 22d of the same month. Taking as assignees of a balance of account, they must be bound by every item in the account, which belonged to it as it then stood, although the transactions previously commenced, out of which it arose, and which it properly embraced, were not then completed, or entries thereof then made; the account may be adjusted afterwards.

It appeared that the sum of $35,301·04 was credited by Grant, Seaver and company in their books to the Hampshire Manufacturing Company, on the 27th of April. This is not perhaps of much importance; but, as indicating the light in which Grant, Seaver and company viewed the transaction, and intended to represent it, and have it understood by their principals, it may be regarded as worthy of some consideration. It was urged, that this entry could not bind their assignees, because it was made after the assignment. It is true, that if the assignment was made on the 22d, and the Hampshire Manufacturing Company had notice of it, nothing could be done afterwards by the assignors to discharge the debt, or essentially to diminish or vary it. But, without stopping to inquire whether the Hampshire Manufacturing Company had such notice or not, it is obvious, that this entry had no such tendency; if the company were entitled to the credit, they were entitled to it when the sales to Odiorne were made, which were before tne assignment to Stone and others.

III. The next great subject of controversy between these parties arises from the claim of Shaw and others, as assignees of the Hampshire Manufacturing Company, to charge by way of set-off, against Grant, Seaver and company, the amount of certain drafts, drawn by the agent of the former, and indorsed by the treasurer, which were known in the discussion of the case as " facilities."

These were drafts, drawn by Bartlett, the agent of the company, at Ware, on the house of Dinsmore, Barnett and company of New York, which was in fact a branch of the house of Grant, Seaver and company; the drafts were then

forwarded by Bartlett to the counting room of Grant, Seaver and company, in Boston, oftentimes, and, perhaps it may be said, commonly, in blank ; there they were accepted by one of the firm of Dinsmore, Barnett and company, in the name of that house, such member residing here ; they were made payable to George Seaver, treasurer, and were sometimes indorsed by him personally, if present, otherwise and oftentimes, by Grant, as the attorney of Seaver, Grant having, as he testified, a power from Seaver for that purpose, which had been lost. These drafts were marked as "approved" by Dixon, the president of the company, and were then taken by Grant and negotiated, as occasion offered, to raise money, or to make payments, for the benefit of Grant, Seaver and company.

A vote had been previously passed by the directors, authorizing such bills to be drawn for the benefit and accommodation of Grant, Seaver and company, under an agreement that Grant, Seaver and company would provide for them, and take them up, at maturity. This was an expedient adopted to enable Grant, Seaver and company to use the credit of the Hampshire Manufacturing Company, not for raising money for the company particularly, but generally for their own use and benefit. The transactions under this vote did not appear in the books of the Hampshire Manufacturing Company; they were simply a loan of the credit of the company to Grant, Seaver and company, who issued the drafts at their discretion, and agreed to provide for them when they became due.

In consequence of the failure of Grant, Seaver and company, it became impossible for them, according to their agreement, to pay and take up those of the drafts so issued, which had been negotiated and were then outstanding, amounting to the sum of $59,000. The drafts so outstanding were presented to the assignees, as valid demands, against the manufacturing company, and were allowed, and dividends were paid thereon, to the amount of seventy per cent. The assignees claim a right to charge these drafts in their account, by way of offset against the estate of Grant, Seaver and company, on the ground, that the drafts were issued for their

accommodation, that, by agreement, Grant, Seaver and company were principal debtors, and that the manufacturing company, having, in effect, paid and taken up the drafts, as the drawer or indorser, has a right thus to make use of them as a valid set-off against the amount which the company owed Grant, Seaver and company.

The defendants, as the assignees of Grant, Seaver and company, resist this claim on various grounds, applicable to the different securities, all however founded on the principle, that, if from any cause, the Hampshire Manufacturing Company were not bound and compellable by law to pay all or any of these drafts, — if it could have resisted such payment on any grounds, meritorious or technical, — it could not, by such payment, make Grant, Seaver and company debtors; but that such payment must be considered as a payment in its own wrong, and the loss its own.

An objection, which goes to many of the drafts, is, that the vote of the directors, November 5th, 1836, was not pursued in several particulars, and so the company was not bound. It provided, that such drafts, subject to approval, &c., and indorsed by the treasurer, should be obligatory, &c. Many of these drafts, instead of being indorsed by George Seaver, personally, as treasurer, were indorsed "George Seaver, Treasurer, by B. B. Grant, Attorney." It is objected, that, as the treasurer himself exercised a delegated authority, he could not execute such authority by attorney, or delegate his authority. In order to estimate the weight of this objection, it becomes necessary to consider the relation in which the parties stood to one another, and the nature and character of these securities. This general view will embrace many, perhaps most, of the exceptions taken to this claim of the plaintiffs.

· 1. These bills were not drawn by the Hampshire Manufacturing Company, and were not intended to be drawn, against funds. Dinsmore, Barnett and company, the nominal drawees, were a branch of the house of Grant, Seaver and company. Dinsmore resided here, and, in most instances, accepted the bills in the counting room where they were prepared. Grant

Seaver and company, by agreement, were to stand in place of acceptors, and, as between them and the drawer and indorsers, were the debtors first in order and responsibility.

But the question is, what were the rights of the holders of these drafts, and what were their claims against the Hampshire Manufacturing Company, as the drawer, when the drafts were presented to the plaintiffs for allowance. The persons, by whom they were presented, were holders for value of negotiable securities, taken in the regular course of business, before they became due, and without notice. Their rights did not depend on the vote above mentioned; that vote did not appear on the face of the drafts; and the holders cannot be presumed to have had notice of it. The drafts were drawn by a general and authorized agent of the company, and were made payable to George Seaver, treasurer. This mode of naming the payee, for aught that appears on the drafts, was a *descriptio personæ.* At all events, Seaver appeared as payee, and might indorse by attorney. The drafts, being made payable to George Seaver, personally, described as treasurer, were not like bills made payable to the treasurer for the time being, whoever he might be, but were payable to George Seaver, as a person. Whatever might be his general power as treasurer, his power to indorse drafts, thus made payable to him personally, was an original and not a delegated power, and might be well executed by an attorney lawfully authorized.

2. But the whole case shows, that these drafts were indorsed by Grant, Seaver and company, after the indorsement of Seaver, treasurer, and were put in circulation for their own benefit, and the proceeds applied to their own use. Their subsequent indorsement was a guaranty to the holder, that all the prior indorsements were genuine and regular; and, in any claim against them, by the holder of a draft, they could take no exception to such defective indorsement.

3. The fact, that these bills were issued after they had been approved by Dixon, as president of the Hampshire Manufacturing Company, may be regarded as having some weight. By the vote of the directors, authorizing such an issue of

bills, it is provided, that it should be done with the approval of the president. This approval was an assurance, on the part of the company, accompanying the bill, that the draft, as drawn, accepted, and indorsed, was in conformity with the requirements of the directors; and if holders could be supposed to be required to make any inquiry, it tended to preclude such inquiry, by a certificate which might be regarded as satisfactory.

An objection was taken, that some of these drafts had been paid by Shaw, as indorser, without demand on the acceptor, and notice to him as indorser, and that many of them were allowed by the trustees as debts against the company.

There is very good ground to maintain, that, as between these parties, the Hampshire Manufacturing Company, on the one side, and Grant, Seaver and company, on the other, the ordinary rules of law and practice, regulating the rights of parties to bills of exchange, made and negotiated in due course of business, do not apply. This remark is not applicable to third parties, holders of these bills; they were not parties to the original arrangement, under which the drafts were issued, and must stand on their legal rights against the respective parties to the bills, as such holders. But by the original arrangement between the parties, the credit of the company, in the form of these bills, was loaned to Grant, Seaver and company, and was to be wholly redeemed by them. It would seem, therefore, that after a failure, and after the time when Grant, Seaver and company had become unable thus to redeem the drafts, and when any demand and notice would be utterly unavailing and useless, the company, when called upon, might waive all such useless and expensive formalities, and might pay or allow the drafts to be proved as debts; and, if they thought fit to waive such exceptions, Grant, Seaver and company, who were bound as principals, and at all events, to pay, could not object. It has been held, that an indorser, who has paid a bill, bringing an action against a prior party, is not bound to show that he himself, as such indorser, was notified, or would have been legally liable. It

is enough, that he has paid, as indorser, and taken up the bill, without showing that he was legally compellable so to do. *Elsworth* v. *Brewer*, 11 Pick. 316.

4. But we have not thought it necessary to place the decision upon that ground ; there is another which appears to us more decisive.

These bills were drawn by the authorized agent of the Hampshire Manufacturing Company, a trading company with power to draw bills, solely for the accommodation of Grant, Seaver and company, on a branch of their own house, to wit, on Dinsmore, Barnett and company, who had no funds in their hands, or, what is the same thing, for this purpose, none applicable to the payment of these drafts. In this case, therefore, the right of the holders, to proceed against the company as the drawer, was perfect, without demand on the acceptor, or notice to the indorsers. *Walwyn* v. *St. Quintin*, 1 Bos. & Pul. 652. Nor, supposing them to be foreign bills, would a protest be necessary. *Legge* v. *Thorpe*, 12 East, 171.

Another objection taken to some of these drafts is, that they were held by banks or others, who had taken them in payment or as collateral security for illegal loans, or discounts made on blue books or otherwise contrary to law. We have not thought it necessary to inquire very minutely into the character of the alleged illegal loans and discounts, because we think, that, whether illegal or not, it is not an objection, which the drawer of these drafts, the company, could have made, and it is therefore not one which these defendants can make. Supposing the contract to be illegal, between the parties to it, it cannot affect the liability of parties, who did not participate in the transaction. The drawer of a *negotiable instrument cannot defend himself* when called on for payment, by showing that the holder obtained it in part consideration of a transaction which was contrary to law.

Another objection is taken to a part of these drafts, being those held by the American Bank, that Grant, Seaver and company made a settlement with the bank, and gave them

a promissory note for the amount, which is in law a payment of the drafts. But we are of opinion, that this objection cannot prevail. Whether a note given on a settlement is payment or not depends upon the stipulations of the parties. In this commonwealth, it affords a presumption that it was intended as payment. But it is a presumption of fact, and may be rebutted by proof of the true agreement. In this case, it was found, at the time of that settlement, and when the note was taken, it was agreed, that the drafts should be held as collateral security, that is, that the responsibility of the other parties should not be given up. Though, as between these parties, between whom this was all accommodation paper, Grant, Seaver and company were the principal debtors, yet, on the paper, they were only second indorsers. The bank had a right to deal with it, as it appeared to be, that is to say, paper on which the company was the drawer, and Grant, Seaver and company second indorsers. By the settlement with the latter, they did not discharge the company, who were prior parties.

*Decree to be entered accordingly.*